Eduardo C. BAUTISTA, et al., Plaintiffs-Appellants,

v.

PAN AMERICAN WORLD AIRLINES, INC., et al., Defendants-Appellees.

No. 86–2881.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 14, 1987.

Decided Sept. 21, 1987.

Dan Siegel, Oakland, Cal., for plaintiffs-appellants.

Richard Schoolman, Malcolm A. Goldstein and Carole O'Blenes, New York City, for defendants-appellees.

Before MERRILL and NORRIS, Circuit Judges, and ENRIGHT,[*] District Judge.

MERRILL, Circuit Judge:

Pan American World Airways (Pan Am) sold its in-house catering facilities and contracted with Marriott Corporation to provide catering services. Dismissed Pan Am catering employees sued (1) Pan Am for breach of their collective bargaining agreements, (2) Marriott for tortious interference with contractual relations, and (3) the Transport Workers Union (TWU), the employees' former union, for breach of its duty of fair representation. The district court granted summary judgment to Pan Am and the TWU, and held the tort claim preempted. The former employees appeal. We affirm in part, reverse in part, and remand in part.

## I. FACTS

Appellants performed various jobs pertaining to Pan Am's catering services for its airplanes. Their conditions of employment were governed by three collective bargaining agreements, negotiated by their union in 1980. A major issue in the negotiations was Pan Am's desire to phase out its in-house catering facilities and hire an outside catering company. The TWU, which represented some 5000 Pan Am employees, fought to protect the jobs of the approximately 750 catering employees. The resulting compromise was embodied in three (identical) Appendices.

The 1980 Appendices expressly acknowledged Pan Am's right to phase out its in-house catering operations, but also included a "No Layoff Guarantee," in which Pan Am agreed not to lay off current catering employees except in the event of strikes and other circumstances not applicable here. The Guarantee also provided that, "[w]ith the exception of the modifications provided by this [Appendix], the general conditions of the [main] contracts shall remain in full force and effect." The Appendices contained a section entitled "Duration," which stated only that the Appendices "shall become effective on the date of [their] execution." The "Duration" section specified no expiration date, although the main agreement did contain an expiration date.[1]

Pan Am fared poorly from 1980 to 1983. Twice during that period, it requested and received concessions on wages and working conditions from all the unions representing its employees. With the 1980 collective bargaining agreements to expire at the end of 1984, Pan Am notified the TWU on September 7, 1984, that it intended to delete the Appendices containing the "No Layoff Guarantee" and make other changes in the collective bargaining agreement pursuant to section 6 of the Railway Labor Act ("RLA"), 45 U.S.C. § 156. After Pan Am and the TWU failed to reach agreement, they turned to the National Mediation Board, see 45 U.S.C. § 155 First, which proved unable to elicit an agreement. After the statutorily-mandated thirty-day

---

[*] Honorable William B. Enright, United States District Judge, Southern District of California, sitting by designation.

[1]. Although the main agreements are not in the record, all parties seem to agree that the main agreements had an explicit expiration date of June 30, 1983, which was later extended to December 31, 1984.

cooling off period, *see id.*, the parties exercised their rights to self help: the TWU struck, and Pan Am sold its catering facilities and contracted with Marriott to provide catering services. Appellants claim that TWU officials, while urging them to strike, told them that their jobs would be protected by the "No Layoff Guarantee."

After a four-week strike, the parties reached an agreement on March 23, 1985. Pan Am agreed to retain up to 75 catering employees. The other catering employees had to choose between dismissal with a severance payment and priority in filling noncatering positions for which they could qualify. The "No Layoff Guarantees" were abolished. These changes were ratified by a majority of the employees represented by the TWU.

Appellants, who lost their jobs after the strike ended, sued Pan Am, Marriott, and the TWU in federal district court. Judge Patel found that she had jurisdiction over the claim against Pan Am, and held as a matter of law that the 1980 Appendices created no right to lifetime employment. She then granted the TWU's motion for summary judgment because the union's renegotiation of the "No Layoff Guarantees" was reasonable under the circumstances. Finally, the district court held that the former employees' claim that Marriott had tortiously induced Pan Am to breach its collective bargaining agreement was preempted by federal law, because it required a court to interpret the labor agreement when that task was properly for the National Railway Adjustment Board. The dismissed employees now appeal as to all three defendants.

## II. THE UNION'S DUTY OF FAIR REPRESENTATION

The dismissed employees claim that the TWU breached its duty of fair representation ("DFR") when it agreed in 1984 to the abolition of their "No Layoff Guarantees." Their theory is that the 1980 Appendices gave each appellant a "vested" right to lifetime employment, which the union was powerless to bargain away without each

employee's personal consent. Appellant's further allege that the TWU acted in bad faith when union officials, in order to persuade the catering employees to join the strike, told them that the 1980 Appendices would protect their jobs.

Under the Railway Labor Act,[2] unions have a duty to represent their members fairly. *See Steele v. Louisville & Nash. R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). Although the RLA generally gives employees no right of action to sue their employers over labor disputes in federal court, district courts do have jurisdiction under 28 U.S.C. § 1337 to hear unfair representation claims against unions. *See Crusos v. United Trans. Union, Local 1201*, 786 F.2d 970, 973 (9th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 409, 93 L.Ed.2d 361 (1986). A union breaches its duty when its conduct is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The duty of fair representation extends to a union's conduct in negotiating collective bargaining agreements as well as in pursuing grievances on behalf of individual employees. *See Schultz v. Owens-Illinois Inc.*, 696 F.2d 505, 514 (7th Cir.1982). In the context of representing its members at the bargaining table, a union must be allowed a "wide range of reasonableness" because it must be able to focus on the needs of its membership as a whole without undue fear of lawsuits from individual members disgruntled by the result of the collective process. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). " 'The complete satisfaction of all who are represented is hardly to be expected.' " *Hays v. National Elec. Contractors Ass'n*, 781 F.2d 1321, 1324 (9th Cir.1985) (quoting *id.*).

The TWU's conduct fell well within the "wide range of reasonableness" we must accord it. When the TWU accepted the 1985 agreement, Pan Am had sold its catering operations and had signed its contract with Marriott. At that point, it was

---

**2.** Airlines are governed by the Railway Labor    Act. *See* 45 U.S.C. § 181.

hardly unreasonable for the union to give up its goal of retaining appellants' jobs and to negotiate severance payments and other viable options for the catering employees instead.

■ Appellants' "vested rights" argument does not persuade us otherwise. We need not decide, as the district court did, whether the 1980 Appendices created rights to lifetime employment that the union could not properly bargain away. Rather, we rule that the lack of an explicit guarantee of lifetime employment like the one in *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1118 (6th Cir.1981) (enforcing a provision that employees "will be continuously employed for the remainder of their working lives...."), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982), coupled with the presence of an explicit expiration date in the main agreements, raised at least enough doubt about the meaning of the Appendices for the union reasonably to conclude that it should renegotiate the provisions in the face of Pan Am's sale of its catering facilities. *Cf. Fechtelkotter v. Air Line Pilots Ass'n, Int'l*, 693 F.2d 899 (9th Cir.1982) (holding that a union did not violate its DFR even though it erroneously fined several members pursuant to its misinterpretation of the collective bargaining agreement). This result is consistent with this Circuit's view of collective bargaining as establishing a "continuing relationship," designed to promote "rational accommodations to changing economic circumstances." *Hendricks v. Airline Pilots Ass'n, Int'l*, 696 F.2d 673, 677, 678 (9th Cir.1983).[3]

Appellants also claim that certain allegedly misleading statements by local union officials violated the union's DFR. The signed Declaration of Kenneth E. Lundy, one of the appellants, includes the following paragraph:

4. In February, 1985, we were told by the TWU that the mechanics would be striking and that we must honor their picket lines. We were told by the TWU that our jobs would be protected by the 1980 [Appendix] and that we had nothing to worry about. During the strike, the TWU local treasurer, Dale Pendleton, assured us that we had nothing to worry about since our jobs were secured. Once the strike was over, we would be back to work. The commissary workers and port stewards did not want to strike but we were required by the TWU to honor the pickets of the mechanics. (E.R. 149-50)

■ Intentionally misleading statements by union officials designed to persuade members to join in collective action, such as a strike or ratification of a newly negotiated agreement, can supply the bad faith necessary to a DFR violation. For example, in *Anderson v. United Paperworkers Int'l Union*, 641 F.2d 574 (8th Cir.1981), the union had negotiated a new collective bargaining agreement that included severance pay provisions. In order to persuade the members to ratify the agreement, a union official assured them that a special security fund existed that would guarantee the severance payments. The official knew that no such fund existed. The employees received only partial payments when the company went bankrupt, and they sued the union. The court held that the misrepresentations breached the union's DFR, but found that the employees had not adequately proved that the misstatements had caused plaintiffs' injuries.

■ Even putting aside the questions of proximate cause and reasonable reliance, the misrepresentations alleged here do not amount to a breach of the union's DFR. In *Anderson*, the union official knew that the collective bargaining agreement did not contain any provisions for a special security fund and that the company did not have one. Here, the local union official was merely giving his interpretation of the "No Layoff Guarantee." In fact, the appellants are urging the very same interpretation of that provision in this court. There is some

---

3. We emphasize that in disposing of the claim against the TWU, we have not decided whether the 1980 Appendices created a right to lifetime employment. As is more fully discussed below, appellants may still bring their breach of contract claim against Pan Am before the Adjustment Board.

irony in the appellants' suggestion that the union officials should have had the clairvoyance in 1985 to know that the interpretation appellants urge upon the court now will ultimately be rejected.

Moreover, the doctrine in this area should reflect the realities of labor relations. Thus the Seventh Circuit has persuasively stated:

> [E]very inaccuracy should not form the basis of a federal suit. A strike often presents unique pressures. The atmosphere may be tense, charged and confused. The situation is intensely adversary. Decisions and statements are sometimes made in haste, under pressure and in the belief that the other side is disseminating manipulated or distorted information to which a response is required. Union leaders, in exhorting the membership, may voice opinions that later prove inaccurate, or make claims that turn out to be hyperbole. So long as such statements are not intentionally misleading and are not of a nature to be reasonably relied upon by the membership—rather than discounted as partisan exhortation delivered under conditions of conflict—they may not rise to the level of invidious actions barred by the duty of fair representation. To conclude otherwise would have a chilling effect on the right to strike itself by instilling a fear of unjustifiable lawsuits. We emphasize that we do not condone fabrications designed to mislead the membership. But there must be a demanding standard for measuring such violations.

*Swatts v. United Steelworkers of America,* 808 F.2d 1221, 1225 (7th Cir.1986). The statements at issue here are nothing more than "partisan exhortation delivered under conditions of conflict," *id.,* and thus cannot form the basis of a DFR claim. We affirm the district court's grant of summary judgment in favor of the TWU.

## III. THE BREACH OF CONTRACT CLAIM AGAINST PAN AM

Appellants contend that Pan Am violated its 1980 collective bargaining agreement by firing them in 1985. The district court found that it had jurisdiction over this claim according to the principles expressed in *Glover v. St. Louis-S.F. Ry.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969). It then reached the merits and granted Pan Am's motion for summary judgment. We reverse because the district court had no jurisdiction over the appellants' claim against Pan Am.

The Railway Labor Act provides that disputes between employees and carriers "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," 45 U.S.C. § 153 First (i), are within the exclusive jurisdiction of the National Railroad Adjustment Board. *See Andrews v. Louisville & Nash. R.R.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). The Act provides federal court jurisdiction only to review the final award of the Adjustment Board on very limited grounds. *See* 45 U.S.C. § 159 Third.

In *Glover,* the Supreme Court created an exception to this statutory scheme. In that case the complaint alleged that management and the union had acted "in concert" to bar black employees from promotions on account of their race. 393 U.S. at 331, 89 S.Ct. at 552. The Court reasoned that resort to the Adjustment Board in such a case would have been "absolutely futile," because the Board comprises only union and management representatives, the very groups against which the employees' complaint was made. *Id.* Therefore, the employees were permitted to circumvent the statutory administrative remedies and sue the union and the employer together in federal district court.

The *Glover* rationale does not apply here. Under *Glover* it is the fact that claims against both the union and the employer must be adjudicated that renders the Adjustment Board incompetent to resolve the dispute. Here, however, the employees' unfair representation claim does not survive the union's motion for summary judgment. If an employee sues both his employer and his union in federal district court, the court must first examine the claim against the union. If, as here, the

employee does not have a triable claim against the union, then all that is left is his claim against the employer. In that event, *Glover* does not apply and the RLA requires that the claim be heard before the Adjustment Board. *See Franklin v. Southern Pac. Transp. Co.*, 593 F.2d 899, 902 (9th Cir.1979).

The mere fact that the union disagrees with the dismissed employees on the merits of their wrongful discharge claim does not mean that resort to the Adjustment Board would be "absolutely futile" within the meaning of *Glover.* 393 U.S. at 331, 89 S.Ct. at 552. Were that the rule, employees could almost always circumvent the RLA's procedures by tacking on a DFR claim against their union in a federal court suit against their employer. Named as a defendant in a lawsuit brought by employees, the union would almost always oppose the employees' view on the merits. *Glover* was not predicated on mere disagreement between the employees and the union on the merits of a grievance, but on the fact that the Adjustment Board, according to the plaintiffs' allegations, would have been infected with racial bias. Ours is a case of legal disagreement, not one of invidious discrimination or unjustified hostility. We therefore hold that the district court lacked jurisdiction over appellants' claim against Pan Am.

## IV. THE STATE TORT CLAIM AGAINST MARRIOTT

The district court held that the former employees' state-law tort claim against Marriott is preempted by the RLA. We do not reach this issue because the district court did not properly ascertain whether it had subject matter jurisdiction over the claim against Marriott.

The complaint alleges generally that the district court had jurisdiction over the tort claim by virtue of diversity of citizenship between the plaintiffs and Marriott. *See* 28 U.S.C. § 1332. "The essential elements of diversity jurisdiction, including the diverse residence of all parties, must be affirmatively alleged in the pleadings." *In re Mexico City Aircrash*, 708

F.2d 400, 404 n. 4 (9th Cir.1983). Although the complaint does allege that Marriott's corporate citizenship is in "a State other than California," nowhere does it allege that the plaintiffs are all citizens of California. The district court made no factual findings on this issue, and we cannot say that resolution thereof is possible from the face of the pleadings. We therefore remand for a resolution of this jurisdictional issue.

## V. CONCLUSION

We affirm the district court's judgment only with respect to its grant of summary judgment in favor of the union. We reverse the district court's exercise of jurisdiction over the claim against Pan Am. Finally, we remand the claim against Marriott for resolution of the question whether the district court had subject matter jurisdiction over this state-law action.

AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART.

No costs are awarded.